**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

BELINDA ROBINSON,         )
         )
       Plaintiff,      )
         )
     v.        )     Civil Action No. 10-1568
         )     Judge Nora Barry Fischer
MICHAEL J. ASTRUE,      )
COMMISSIONER OF SOCIAL    )
SECURITY,        )
         )
       Defendant.    )

## MEMORANDUM OPINION

### I.  INTRODUCTION

Belinda Robinson ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f].  The record has been developed at the administrative level. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence. Therefore, the Commissioner's Motion for Summary Judgment (Docket No. 9) is GRANTED and the Plaintiff's Motion for Summary Judgment (Docket No. 7) is DENIED.

### II.  PROCEDURAL HISTORY

Plaintiff filed an application for SSI benefits under the Act on May 27, 2008, alleging disability due to depression, tendonitis and arthritis beginning March 1, 2003. (R. at 9, 47, 77-79). Plaintiff's claim was initially denied on September 12, 2008 and Plaintiff filed a request for

a hearing on October 2, 2008. (R. at 9). A hearing was held before an ALJ on March 31, 2010.

(R. at 9, 35-46). Plaintiff, along with a Vocational Expert ("VE"), appeared and testified at the

hearing. (R. at 9). On May 13, 2010, the ALJ issued a decision finding the Plaintiff not disabled

under § 1614(a)(3)(A) of the Act. (R. at 19). The ALJ found that the Plaintiff had the ability to

perform light work in a low stress work environment and that there are jobs that exist in

significant numbers in the national economy that the Plaintiff could perform. (R. at 17-18). On

May 25, 2010, Plaintiff requested a review of the ALJ decision by the Appeals Council. (R. at

74-76). Plaintiff's request for review of the ALJ's decision was denied on October 6, 2010,[1]

thereby making the ALJ's decision final. (Document 8 at 1). The Plaintiff also filed for SSI

benefits on May 8, 2001, but that application is too remote in time to be reopened. (R. at 9).

Having exhausted all administrative remedies, Plaintiff filed this action on November 29, 2010.

(Docket No. 3). Plaintiff then filed a Motion for Summary Judgment on March 14, 2011.

(Docket No. 7). The Commissioner filed his Motion for Summary Judgment on April 4, 2011.

(Docket No. 9).

### III. STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Demczyk v. Astrue*, Civ.

Act. No. 10-239, 2010 WL 4257599 (W.D.Pa. Oct. 21, 2010) (citing *Schaudeck v. Commissioner*

*of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999)). With respect to factual

issues, judicial review is limited to determining whether the Commissioner's decision is

"supported by substantial evidence." 42 U.S.C. § 405(g); *Caminiti v. Astrue*, Civ. A. No. 09-64,

2010 WL 3186697 (W.D.Pa. Aug. 11, 2010) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir.

1994)). The Court may not undertake a *de novo* review of the Commissioner's decision or re-

---

[1] The dates cited in the Plaintiff's Brief (Document 8) relating to Plaintiff's benefits application, ALJ hearing, and
ALJ decision are different from the dates listed in the record (Document 5 to 5-7).

weigh the evidence of the record. *Crawford v. Astrue*, Civ. A. No. 08-1160, 2009 WL 1033611 (W.D.Pa. Apr. 15, 2009) (citing *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986)). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Price v. Barnhart*, 129 F.App'x. 699, 700 (3d Cir. 2005). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Dominski v. Astrue*, Civ A. No. 07-3595, 2008 WL 4589903 (E.D.Pa. Oct. 2008) (citing *Hartranft v. Apfel*, 181 F.3d 358,360 (3d Cir. 1999)). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d. Cir. 2004). To determine whether a finding is supported by substantial evidence, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

Judicial review of the Commissioner's final decisions on disability claims is governed by statute. 42 U.S.C. §§ 405(g)[2], 1383(c)(3).[3] Pursuant to 42 U.S.C. § 405(g), a district court is to review transcripts and records upon which the Commissioner based his determination. 42 U.S.C.

---

[2] 42 U.S.C. § 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action…brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business. 42 U.S.C. § 405 (g).

[3] 42 U.S.C. § 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405 (g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title. 42 U.S.C. § 1383(c)(3).

§ 405(g). Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding DIB), and judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f, regarding SSI), regulations and decisions rendered under the Title II disability standard 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a). *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d Cir. 2002).

To be eligible for Social Security benefits under the Act, a claimant must demonstrate that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period for at least twelve months. 42 U.S.C. § 423(d)(1)(A); *DeCarlo v. Barnhart*, 116 F.App'x. 387, 3890 (3d Cir. 2004). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Thus, the ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. § 404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 Subpt. P., Appx. 1; (4) whether the claimant's impairments prevent her from performing her past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any

other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considered to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Id.* at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision against the record.

## IV. STATEMENT OF FACTS

### a. Plaintiff's Personal Background

Plaintiff was born on January 12, 1965. (R. at 18). Plaintiff is 46 years old, has never been married, and has 4 children.[4] (R. at 18, 39, 77, 151). Plaintiff completed her education up to

---

[4] During her testimony at the ALJ hearing, Plaintiff stated she had 2 children with whom she lived. (R. at 39). Plaintiff's evaluation by Dr. Bhutta at Mon Yough Community Services states that Plaintiff has 4 children. (R. at 151).

8th grade and has earned her GED.[5] (R. at 39). Subsequent to filing for SSI benefits Plaintiff attended business school full-time for office administration. (R. at 130, 151). Plaintiff was previously employed doing cleaning work at a school and clerical work at a healthcare center. (R. at 40). Plaintiff claims she has been disabled since March 1, 2003 due to depression, tendonitis, and arthritis. (R. at 47). Plaintiff was 38 years old at the time her alleged disability commenced. (R. at 77). Plaintiff has not worked since December 31, 2004. (R. at 84). Plaintiff has a history of smoking cigarettes and denies any alcohol or drug abuse. (R. 126, 138, 173).

### b. Plaintiff's Medical Background

#### i. *Department of Public Welfare Medical Assessment: May 23, 2007*

On May 23, 2007, Plaintiff was declared permanently disabled by Dr. Omar Bhutta due primarily to recurrent major depression.[6] (R. at 122). Dr. Bhutta also noted a tertiary diagnosis of hypothyroidism.[7] (*Id*.).

#### ii. *UPMC Community Medicine Inc., Latterman Family Health Center: April 6, 2004 through March 18, 2008*

On April 6, 2004, Plaintiff was seen by Dr. Haritha Yalamanchilli for an annual gynecological exam, to discuss allergy medications, and to check the dosage of synthroid[8] Plaintiff was taking. (R. at 140). The report notes Plaintiff has a past medical history of sexually

---

[5] During her testimony at the ALJ hearing, Plaintiff stated she completed school up to 8th grade before getting her GED. (R. at 39). Plaintiff's evaluation by Dr. Bhutta stated that she had completed 10th grade before getting her GED. (R. at 151).

[6] Major depression is a mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[7] Hypothyroidism is the diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to gain weight, somnolence, and sometimes myxedema. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[8] Synthroid is a brand name for Levothyroxine. Levothyroxine is a thyroid hormone used to treat hypothyroidism. It reverses the symptoms of hypothyroidism. It is also used to treat congenital hypothyroidism (cretinism) and goiter (enlarged thyroid gland). NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000684/

transmitted diseases of Trichomonas, Chlamydia, and Gonorrhea. (R. at 141). It also notes that

Plaintiff suffers from the thyroid disease, hypothyroidism and is a smoker. (*Id*.).

On February 10, 2005, Plaintiff again visited Dr. Haritha Yalamanchilli for a general

follow-up exam regarding her hypothyroidism and depression. (R. at 137). Plaintiff informed Dr.

Yalamancilli that she has been having difficulty sleeping and suffering from night sweats. (R. at

137-38). The report noted that the Plaintiff was in school for medical billing. (R. at 138). Dr.

Yalamanchili prescribed trazodone[9] for the depression and Synthroid for the hypothyroidism.

(*Id*.). Dr. Yalamanchilli also counseled Plaintiff and gave her information about quitting

smoking. (*Id*.).

On August 18, 2005, Plaintiff was seen by Dr. Sandar Win for a routine pap smear and

gynecological exam. (R. at 134). No changes in Plaintiff's health or complications were noted on

the final report for this visit. (*Id*.).

On September 22, 2005, Plaintiff again saw Dr**.** Win for depression and to have a

temporary disability form completed. (R. at 130). Plaintiff informed Dr. Win that she was

suffering from insomnia, anxiety, loss of appetite, decreased attention span, and weight gain. (R.

at 131). Dr. Win diagnosed Plaintiff with depression  and hypothyroidism due to a defect in

thyroid hormone synthesis and prescribed trazodone , Zoloft[10], and Synthroid . Dr. Win also

filled out the temporary disability form for September 9, 2005 through November 22, 2005. (*Id*.).

Plaintiff was advised to go to Mon Yough Community Services for mental health services. (R. at

---

[9]       Trazodone is a serotonin modulator medication used to treat depression. It increases the amount of
serotonin, a natural substance in the brain, that helps maintain mental balance. NATIONAL CENTER FOR
BIOTECHNOLOGY INFORMATION, U.S. NATIONAL LIBRARY OF MEDICINE,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530/
[10]      Zoloft is a brand name for Sertraline. Sertraline is a medication used to treat depression, obsessive-
compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. Sertraline is in the
selective serotonin reuptake inhibitors class of antidepressants and works by increasing the natural substance in the
brain serotonin to maintain brain balance. NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, U.S.
NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017/

132-33). Dr. Win's report noted Plaintiff's history of tendonitis in her right wrist, hypothyroidism, sickle cell trait, and depression. (R. at 131). Her report also noted that Plaintiff had two prior surgeries, a tubal ligation and a cyst removal from her right wrist. (*Id.*).  An addendum to the report by Dr. Daphne Bicket showed concern about Plaintiff's ability to complete job training and maintain employment. (R. at 133)

On March 18, 2008, Plaintiff was seen by Dr. Irene Macalua for a routine pap smear and gynecological exam. (R. at 125). The report from this exam notes that Plaintiff has a history of cigarette smoking, hypothyroidism, depression, irregular menses, sexually transmitted diseases, and a past tubal ligation. (R. at 125-126). Overall, Dr. Macalua noted that it was a routine exam with no complications. (R. at 127).

     *iii.* <u>*Mon Yough Community Services, Inc.: August 21, 2006 through April 30,*</u>
        <u>*2008*</u>

On August 21, 2006, Plaintiff underwent a psychiatric evaluation by Dr. Omar Bhutta. (R. at 151). In observation of Plaintiff's mental status, Dr. Bhutta noted that Plaintiff  has difficulty falling asleep, has a decreased appetite, is anxious and has a dysphoric mood. (*Id.*). Dr. Bhutta also noted that Plaintiff has good impulse control, good hygiene, a cooperative attitude, and her speech is within normal limits. (*Id.*). Dr. Bhutta observed no auditory or visual hallucinations, no delusional thinking, and found her judgment and insight to be "modest." (R. at 152).  Plaintiff was diagnosed with major depression and hypothyroidism, and assessed as having a Global Assessment of Function [11] ("GAF") of 50. (*Id.*). Dr. Bhutta prescribed Remeron[12] and referred Plaintiff to individual therapy. (*Id.*).

---

[11]     Global Assessment of Functioning is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") at 34. (4th ed. 2000).

[12]     Remeron is a brand name for Mirtazapine. Mirtazapine is an antidepressant medication used to treat depression. It increases certain types of brain activity to maintain mental balance.

On May 9, 2007, Plaintiff saw Dr. Bhutta for a mental status examination. (R. at 149). He found her appearance to be alert, affect subdued, and mood dysphoric. (*Id*.). Dr. Bhutta also found Plaintiff exhibited good impulse control, judgment, and insight. (*Id*.). He found no delusional thinking, no auditory or visual hallucinations, and no suicidal or homicidal ideations. (*Id*.). Dr. Bhutta confirmed Plaintiff's major depression recurrent diagnosis and continued her treatment with Remeron. (R. at 150). Plaintiff's GAF was assessed at 55. (*Id*.).

On August 13, 2007 Plaintiff underwent another mental status examination by Dr. Bhutta for her major depression recurrent diagnosis. (R. at 147). Dr. Bhutta noted Plaintiff's affect was brighter and her mood was less dysphoric. (*Id*.). He found her to have good impulse control and her judgment and insight to be intact. (*Id*.). Dr. Bhutta again found no delusional thinking, no auditory or visual hallucinations, and no suicidal or homicidal ideation. (*Id*.). Dr. Bhutta continued treatment of Plaintiff's depression with Remeron and assessed her GAF at 60. (R. at 148).

On April 30, 2008, Plaintiff saw Dr. William Cutlip for an evaluation due to her major depressive disorder. (R. at 145). Dr. Cutlip found Plaintiff to be fully oriented, in a euthymic mood, and with good attention and concentration. (*Id*.). He also found that her speech was normal, her stream of thought well organized, and her insight and judgment to be fairly good. (*Id*.). Dr. Cutlip found no suggestion of impulsivity, no delusional ideation, and no suggestion of active hallucinosis or dissociation. (*Id*.). Dr. Cutlip confirmed Plaintiff's diagnosis of major depression recurrent and assessed her GAF at 55. (R. at 146). Dr. Cutlip advised Plaintiff to seek individual therapy and continued her treatment with Remeron. (*Id*.).

*iv.* *State Agency Examiner: Dr. Edward Zuckerman, Ph.D: July 30, 2008*

On July 30, 2008, Dr. Edward Zuckerman, Ph.D. completed a Psychiatric Review Technique Form SSA-2506-BK regarding the Plaintiff's alleged mental infirmities. (R. at 159). Dr. Zuckerman noted that Plaintiff's medical disposition impairment was not severe and that her disposition was based upon an affective disorder. (*Id.*). Dr. Zuckerman determined that Plaintiff suffered from Major Depressive Disorder[13], but that the impairment did not satisfy the diagnostic criteria listed in Section 12.04 of the Psychiatric Review Technique Form. (R. at 162). Dr. Zuckerman also evaluated the Plaintiff's functional limitations. He noted a mild limitation on Plaintiff's restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. at 169). Dr. Zuckerman did not find sufficient evidence to determine any repeated episodes of decompensation of extended duration. (*Id.*). He also found that the evidence provided did not show the disorder lasted 2 years or caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support. (R. at 170). In finding such, Dr. Zuckerman determined that Plaintiff's impairment did not establish the presence of "C" criteria on the Psychiatric Review Technique Form. (*Id.*). Notes from the consultant on the form indicated that the claimant's statements were partially credible. (R. at 171).

*v.* *R. Curtis Waligura, DO: September 3, 2008 through September 9, 2008*

On September 3, 2008, Dr. Waligura telerecorded his medical report based on his examination of the Plaintiff. (R. at 172). Dr. Waligura evaluated the Plaintiff for depression, tendinitis[14], and arthritis[15]. (*Id.*). In his report, Dr. Waligura noted that Plaintiff's depression

---

[13]    *See* n. 4, *supra.*
[14]    Tendinitis is the inflammation of a tendon. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

goes back three to four years and that she was being treated with Remeron and was going to Mon Yough Mental Health Center on a regular basis. (*Id.*). Plaintiff denied any suicidal ideations, or attempts or any treatments from the hospital psychiatric unit. (*Id.*).

Dr. Waligura reported that Plaintiff's arthritis mainly affects her hands and wrist and that it had been two years since her last cortisone injection[16] in her right wrist. (R. at 172-73). He noted that she had a cyst removed from the back of her right hand. (R. at 173). When asked by Dr. Waligura, Plaintiff denied any back or neck pain and stated that she had not had any joint injections in her knees or hips. (*Id.*). Plaintiff told Dr. Waligura that moving her hands, lifting, and repetitive motions made her symptoms feel worse. (*Id.*) Dr. Waligura noted that Plaintiff had not had any recent x-rays of her joints and that she stated she was not aware of any x-rays of her joints or back showing any arthritic changes. (*Id.*).

Dr. Waligura's report also noted Plaintiff's past medical and surgical history, family history, and social history. (R. at 173). Plaintiff previously had a tubal ligation and had been diagnosed with an underactive thyroid, that she was on thyroid replacement therapy for at the time of the evaluation. (*Id.*). Plaintiff's only relevant family history is that her mother died from colon cancer. (*Id.*). Dr. Waligura noted that Plaintiff lived alone with her 3 children, is a smoker, and does not abuse alcohol, medication, or illegal drugs. (*Id.*). Plaintiff's last employment was approximately two years prior to Dr. Waligura's evaluation and was with UPMC. (*Id.*).

Dr. Waligura also performed a physical examination of the Plaintiff. (*Id.*). He reported that she was awake, alert, and oriented without any obvious signs of distress. (*Id.*). He recorded her as 66 inches tall and weighing 173 pounds. (R. at 173). Plaintiff's vision was 20/20 in both

---

[15]    Arthritis is the inflammation of a joint or a state characterized by inflammation of the joints. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).
[16]    A cortisone injection help relieve pain and inflammation in a specific area of the body. A cortisone injection usually includes a corticosteroid medication and a local anesthetic. http://www.mayoclinic.com/health/cortisone-shots/MY00268.

eyes when wearing her glasses. (R. at 174). Dr. Waligura noted no issues with Plaintiff's neck, heart, lungs, abdomen, skin, or extremities (other than a scar on her right hand from her previous surgery). (*Id.*). When examining her neurologic functions, Dr. Waligura found everything to be normal other than tenderness in Plaintiff's wrist and hands. (*Id.*). Dr. Waligura's overall impression was that Plaintiff had a history of depression, weight gain secondary to Remeron therapy, and tendinitis/fibrositis[17]. (*Id.*).

### vi. *Janet A. Bell: September 11, 2008*

On September 11, 2008, Janet A. Bell completed a Physical Residual Functional Capacity Assessment, Form SSA-4734-BK, regarding the Plaintiff's physical infirmaties. (R. at 176). Dr. Bell noted no exertional, postural, manipulative, visual, communicative, or environmental limitations. (R. at 177-79). Ms. Bell's assessment is based on notes from UPMC Community Medicine, Inc. and Dr. Waligura's medical report. (R. at 181). The UPMC notes showed that Plaintiff had normal blood pressure and pulse, was 66 inches tall, and weighed 156 pounds. (*Id.*). Her physical exam notes showed normal results with no issues with Plaintiff's musculoskeletal system or extremities. (*Id.*). Dr. Waligura's report  showed Plaintiff's history of tendonitis and arthritis mainly affecting her hands and wrists. Plaintiff's physical examination by Dr. Waligura was normal only showing tenderness in her wrists and hand area, particularly in the right. (*Id.*).

In assessing the credibility of Plaintiff's statements regarding her medical condition, Dr. Bell took into account the character of Plaintiff's symptoms and her activities of daily living. (*Id.*). Dr. Bell concluded that the daily activities Plaintiff described were not significantly limited in relation to her alleged symptoms. (*Id.*). Dr. Bell found that Plaintiff received appropriate care

---

[17]     Fibrositis is an inflammation of fibrous tissue. The term is used to denote generalized muscle aching, soreness, or stiffness, with multiple tender foci (trigger points); of unknown etiology; was used formerly to describe the syndrome now known as fibromyalgia. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

for her tendonitis/fibrosis, had undergone physical therapy, and had taken medications that were effective in controlling her symptoms. (*Id.*). Based on all the evidence considered, Dr. Bell concluded that Plaintiff's statements were partially credible. (*Id.*).

> vii. *Latterman Family Health Center: October 3, 2008 through December 30, 2009*

On October 3, 2008, Plaintiff saw Dr. Anne B. Silao-Solomon for her hypothyroidism and anemia[18]. (R. at 223). Dr. Silao-Solomon found that Plaintiff's thyroid function tests were within normal range and that she had gained weight, but Plaintiff attributed her weight gain to her Remeron therapy. (R. at 224). Dr. Silao-Solomon also found that Plaintiff's anemia course is improving, but that her last blood test results showed an iron deficiency (she also noted that Plaintiff was suffering from constipation). (*Id.*). Dr. Silao-Solomon's physical examination of the Plaintiff was normal other than an enlarged thyroid. (R. at 225). Dr. Silao-Solomon concluded that Plaintiff was still suffering from hypothyroidism and anemia, continued her same medications, and ordered testing to be done on Plaintiff's thyroid and blood. (*Id.*).

On June 1, 2009, Plaintiff went to Dr. Elena Cotulbea for a gynecological exam. (R. at 204). Dr. Cotulbea noted no changes in Plaintiff's medical history since her last visit. (R. at 205). Dr. Cotulbea recorded that Plaintiff has been living with hypothyroidism for about 10 years, which is being treated with Synthroid, and that her dosage of Synthroid had recently been decreased. (*Id.*). It was also noted that Plaintiff was under psychiatric care at Mon Yough. (*Id.*). Dr. Cotulbea's physical examination results, including a psychiatric analysis, were normal other than an enlarged thyroid. (R. at 206). Dr. Cotulbea noted that Plaintiff had a tobacco use

---

[18] Anemia is any condition in which the number of red blood cells, the amount of hemoglobin in 100 ml of blood, and/or the volume of packed red blood cells/100 ml of blood are less than normal; clinically, generally pertaining to the concentration of oxygen-transporting material in a designated volume of blood, in contrast to total quantities as in oligocythemia, oligochromemia and oligemia. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

disorder, hypothyroidism, abnormal pap smear results, family history of colon cancer, a tubal

ligation, and was due for a mammogram[19]. (R. at 207). Dr. Cotulbea continued Plaintiff's

Synthroid and Remeron medications as well as her iron supplement. (R. at 208).

On February 24, 2009, Plaintiff saw Dr. Ayman Mounir Fakeh to have a rash on her chest

and abdomen examined. (R. at 197). Plaintiff told Dr. Fakeh that the rash had been present for

about a week, was itchy, and that topical steroid creams did not help. (R. at 198). She stated that

she had not started any new medications, been in contact with children or sick people, and had

not started using any new soaps. (*Id*.). Dr. Fakeh diagnosed the rash as pityriasis rosea[20]. (R. at

199). Dr. Fakeh told the Plaintiff that no treatment was necessary; he only recommended oatmeal

baths, Zyrtec,[21] or Benadryl[22] to relieve the itching. (*Id*.).

On December 30, 2009, Plaintiff was seen by Dr. Maria A. Gayanilo to have another rash

examined and to discuss back pain she was experiencing. (R. at 189). Plaintiff told Dr. Gayanilo

that she has been experiencing lower back pain off and on ever since she felt a "pop" in her back

while helping someone lift a sofa 2-3 years prior to this visit. (R. at 190). Plaintiff stated that this

back pain is more prominent on her right side and that it sometimes spreads down into her lower

---

[19]     A mammogram is the record produced by mammography. Mammography is the radiologic examination of
the female breast with equipment and techniques designed to screen for cancer. STEDMAN'S MEDICAL
DICTIONARY (28th ed. 2006).
[20]     Pitryriasis rosea is a self-limited eruption of macules or papules involving the trunk and, less frequently,
extremities, scalp, and face; the lesions are usually oval and follow the crease lines of the skin; occurs most
commonly in children and young adults and is frequently preceded by a single larger scaling lesion known as the
herald patch. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).
[21]     Zyrtec is a brand name for Cetirizine. Cetirizine is a medication used to temporarily relieve the symptoms
of hay fever and allergy due to other substances. Cetirizine is also used to treat itching and redness caused by hives,
but does not prevent hives or other allergic skin reactions. Cetirizine is an antihistamine and works by blocking the
action of histamine, a substance in the body that causes allergic symptoms.  NATIONAL CENTER FOR
BIOTECHNOLOGY INFORMATION, U.S. NATIONAL LIBRARY OF MEDICINE,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001035/
[22]     Benadryl is a brand name for Diphenhydramine. Diphenhydramine is a medication used to relieve red,
irritated, itchy, watery eyes; sneezing; and runny nose caused by hay fever, allergies, or the common cold. It is also
used to treat cough or throat irritation, motion sickness, and insomnia. Diphenhydramine is an antihistamine that
works by blocking the action of histamine, a substance in the body that causes allergic symptoms. NATIONAL
CENTER FOR BIOTECHNOLOGY INFORMATION, U.S. NATIONAL LIBRARY OF MEDICINE,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000704/

extremities. (*Id.*). Plaintiff told Dr. Gayanilo that her rash started two weeks ago and that prior to this visit she had been diagnosed with pitryiasis rosea. (*Id.*). Dr. Gayanilo's record of Plaintiff's medical history shows hypothyroidism, iron deficiency anemia, depression, sickle cell trait, smoking, and drinking. (*Id.*). The report shows that Plaintiff was 66 inches tall and weighed 201 pounds at the time of this visit. (*Id.*). Dr. Gayanilo prescribed Diclofenac[23] and Flexeril[24] for Plaintiff's back pain, and Triamcinolone[25] ointment for her rash. (R. at 191). Dr. Gayanilo also found that Plaintiff had elevated blood pressure and was obese and counseled Plaintiff on lifestyle and diet modifications that would be necessary to address these problems. (*Id.*).

      *viii.*   <u>Mon Yough Community Services, Inc.: January 12, 2009 to December 22, 2009</u>

On January 12, 2009, Plaintiff went to Dr. William Cutlip for a medication check. (R. 187). At this visit, Plaintiff reported that she was having trouble sleeping but did not have any suicidal thoughts or psychotic symptoms. (*Id.*). Dr. Cutlip noted that Plaintiff was fully oriented, had good attention and concentration, had mildly constricted affect, and had a euthymic mood. (*Id.*). Dr. Cutlip also found that Plaintiff's stream of thought was well-organized, she had fairly good insight and judgment, she expressed no delusional ideation, and that there was no suggestion of active hallucinosis or dissociation. (*Id.*). She was assessed as having recurrent

---

[23]     Diclofenac is a medication used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. Diclofenac is in a class of medications known as NSAIDs and works by stopping the body's production of a substance that causes pain, fever, and inflammation. NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000882/
[24]     Flexeril is a brand name for Cyclobenzaprine. Cyclobenzaprine is a muscle relaxant that is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/
[25]     Triamcinolone is a topical medication used to treat the itching, redness, dryness, crusting, scaling, inflammation, and discomfort of various skin conditions. It is also used to relieve the discomfort of mouth sores. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601124.html

Major Depressive Disorder, in partial remission, and having a GAF of 55. (R. at 188). Dr. Cutlip continued Plaintiff's Remeron therapy and prescribed trazodone to be taken nightly. (*Id*.).

On June 11, 2009, Plaintiff saw Dr. Dennis Wayne for another medication check. (R. at 185). Dr. Wayne found that Plaintiff had a lot of mood lability and mood swings, low energy, and periods of hypomanic episodes in the past. (*Id*.). Dr. Wayne also noted that there was no evidence of psychosis or hallucinations. (*Id*.). He diagnosed Plaintiff has having Mixed Type Bipolar Disorder[26] and assessed a GAF of 50. (R. at 186). Dr. Wayne prescribed Abilify[27] and continued Plaintiff's Remeron treatment. (*Id*.).

On December 22, 2009, Dr. Dennis Wayne met with the Plaintiff for a routine medication check. (R. at 183). Plaintiff reported to Dr. Wayne that she still felt depressed, had low energy and motivation, and that she was taking Remeron that helped her sleep at night. (*Id*.). Dr. Wayne noted that Plaintiff had minimal mood swings and that she exhibited fair judgment and insight. (*Id*.). He made no changes in her assessment, which shows that Plaintiff has Bipolar I Disorder and a GAF of 50. (*Id*.). Dr. Wayne continued her Abilify and Remeron treatment and also prescribed Wellbutrin.[28] (R. at 184).

### ix. *Vocational Expert's Findings*

Tanya Shuler testified as a Vocational Expert (VE) before the ALJ at the hearing held on March 31, 2010. (R. at 44). Ms. Shuler earned her Bachelor of Science in Psychology from the

---

[26] Bipolar Disorder is an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[27] Abilify is a brand name for Aripiprazole. Aripiprazone is a medication used to treat schizophrenia in adults and children 13 years or older. Aripiprazole is in a class of medications called atypical antipsychotics. It works by changing the activity of certain natural substances in the brain. NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/

[28] Wellbutrin is a brand name for Bupropion. Bupropion is a medication used to treat depression. It is also used to treat seasonal affective disorder and to help people quit smoking. Bupropion is in a class of medications call antidepressants and works by increasing activity in the brain. NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000970/

University of Pittsburgh in 1989. (R. at 56). She earned her Master of Education in Rehabilitation Counseling from the University of Pittsburgh in 1992. (*Id*.). Ms. Shuler is certified to be a Rehabilitation Counselor, Qualified Rehabilitation Professional, and a Vocational Expert. (R. at 58). Plaintiff did not object to Ms. Shuler testifying as a VE.

The ALJ asked the VE for her opinion as to the proper classification of the Plaintiff's past work as a cleaner and office helper. (R. at 44). The VE answered that the classification for both of these positions was unskilled and specific vocational preparation (SVP) of 2, light exertional level. (*Id*.). The ALJ also asked the VE whether jobs existed in several regions of the national economy for an individual of the same age, education, and work history that also require light work (with some additional restrictions), and a low-stress environment where the individual would not perform more than simple, routine, repetitive tasks nor have more than minimal contact with the public. (R. at 44-45). In response, the VE testified that there were such jobs including: small parts assembler (over 250,000 jobs in the national economy); sorter (over 260,000 jobs in national economy); and cleaner (over 1,000,000 jobs in national economy), that an individual with the factors listed by the ALJ would be able to perform. (R. at 45). The VE testified that there were no conflicts between the classifications she used and those used in publications of the Department of Labor. (*Id*.).

On cross-examination, Ms. Shuler testified that for a person with the characteristics described by the ALJ to keep any of the jobs she listed, they would need to be at work every day and on time. (*Id*.). Ms. Shuler further stated that for the aforementioned positions, a person would only be permitted to be absent for about half a day per month. (*Id*.). Ms. Shuler also stated that a person in this type of position would be performing on task on the job for 85-90 percent of the work day. (R. at 46).

*x.*  *Administrative Hearing: March 31, 2010*

A hearing regarding Plaintiff's application for SSI benefits was held on March 31, 2010 in Pittsburgh, Pennsylvania before Administrative Law Judge Michael F. Colligan. (R. at 35). Plaintiff appeared in person at the hearing and was represented by an attorney. (R. at 37). Plaintiff's testimony at the hearing revealed the following information: Plaintiff has not worked anywhere since she applied for SSI benefits. (R. at 39). Plaintiff previously worked as a cleaner and an office laborer where she did filing and answered phones. (R. at 40). Plaintiff has lower back pain that extends into her right leg. (*Id*.). Plaintiff has tendonitis in her right wrist and her hand constantly aches. (R. at 40-41). Plaintiff testified that she is anemic and has a thyroid condition. (R. at 42). Plaintiff is taking or has taken medication for her lower back pain, tendonitis, and thyroid condition. (R. at 40, 42). She also stated that her anemia and thyroid condition cause her to feel bad and get sore throats. (R. at 42).  Plaintiff sees Lemoyne Young once a month for depression treatment. (R. at 41). She also sees a therapist and a doctor for her medication. (*Id*.). Plaintiff's depression prevents her from going outside or interacting with people other than her family members. (R. at 42). Plaintiff spends most of her days in her bedroom lying down with her feet propped up. (R. at 42-43). Plaintiff described her energy level as low and that she feels tired and lazy. (R. at 43). Plaintiff's sons help her with tasks such as grocery shopping and cleaning. (*Id*.). Plaintiff stated that she is going to attempt physical therapy treatment for her back pain. (R. at 43-44).

*xi.*  *ALJ's Decision: May 13, 2010*

The ALJ issued his decision on May 13, 2010, concluding that Plaintiff retains the residual functional capacity to perform jobs that exist in significant numbers in the national economy, and as such, her medically determinable impairments do not meet the requirements for SSI benefits. (R. at 18-19). In reaching that determination, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 27, 2008. (R. at 11). Additionally, the ALJ found that Plaintiff has severe impairments of depression and tendonitis/fibrositis. (*Id*.).

However, the ALJ ruled that Plaintiff's impairments or combination of impairments do not meet or medically equal one of the listed impairments in 20 CFR §§416.920(d), 416.925, and 416.926. (R. at 12). The ALJ found that Plaintiff had only a mild, not marked, restriction in activities of daily living and mild difficulties in social functioning. (*Id*.). The ALJ also agreed with the State Agency's findings that there was insufficient evidence showing the Plaintiff experienced episodes of decompensation. (*Id*.). Therefore, the ALJ found that the Plaintiff's alleged mental impairment does not cause two marked limitations or any repeated episodes of decompensation. (R. at 13). The ALJ also found that the evidence did not support a finding of mild difficulties with concentration, persistence, and pace and found that Plaintiff only had moderate difficulties in these areas. (R. at 12). As such, the ALJ found that the criteria for medically listed impairments were not met and that the residual functional capacity would accommodate Plaintiff's difficulties. (R. at 12-13).

The ALJ determined that the Plaintiff has the residual functional capacity to perform light work, which would involve no more than simple, routine, repetitive tasks, and is limited to a low-stress work environment with minimal contact with the public. (R. at 13). The ALJ found that Plaintiff suffered from depression and that it was a severe impairment, inconsistent with Dr. Zuckerman's findings. (R. at 15). The ALJ further determined that Plaintiff's medically

determinable impairments could reasonably be expected to cause some of her alleged symptoms. (R. at 16). However, he found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms are inconsistent with the residual functional capacity determination and unsupported by the medical evidence provided. (*Id.*).

The ALJ found Plaintiff's treatment history for her alleged mental impairment inconsistent and troubling. (R. at 16). He held that two medical sources stating that Plaintiff was unable to work due to depression should be accorded no weight because they conflicted with the evidence as a whole. (*Id.*). The ALJ also determined that Dr. Bicket's note displaying concern for Plaintiff's ability to complete job training to be conclusory because it was based on one appointment and disregarded Plaintiff's statement that she was a full-time student. (*Id.*). Likewise, the ALJ found Dr. Bhutta's Medical Assessment Form indicating that Plaintiff is "permanently disabled" conclusory and afforded it little weight due to a lack of explanation or rationale for such a conclusion. (R. at 16-17).

Regarding Plaintiff's alleged tendonitis/fibrositis, and arthritis impairments, the ALJ concluded that the Plaintiff is capable of performing work at a light exertional level. (R. at 17). The ALJ noted that the record shows the Plaintiff has a past medical history of wrist tendonitis and surgery, but that there are no records showing treatment for hand or wrist discomfort. (*Id.*). The ALJ also found no evidence that Plaintiff complained of pain, discomfort, or functional limitation due to these impairments during the years covered by the evidence. (*Id.*). The ALJ agreed with the determinations made by Dr. Waligura and the State Agency Examiner that Plaintiff's tendonitis/fibrositis did not limit her daily activities and that the impairment was effectively under control. (*Id.*). The ALJ did not find support in the record showing that Plaintiff suffered from back pain that limited her functional abilities. (*Id.*). Instead, the ALJ

acknowledged that Plaintiff's residual functional capacity limiting her to a light exertional level in a low-stress environment accounts for her depression and wrist and back pain limitation. (*Id.*).

The ALJ next recognized that Plaintiff has no past relevant work because the record shows she has never worked for more than a month for any single employer. (R. at 18). Therefore, transferability of job skills is not an issue in this case because the Plaintiff has no past relevant work and the little work experience she does have is unskilled. (*Id.*). Based on the VE testimony, and considering the Plaintiff's age, education, work experience, and residual function capacity, the ALJ found that jobs, such as small parts assembler, sorter, and cleaner, exist in significant numbers in the national economy and that the Plaintiff could perform these jobs. (*Id.*). Accordingly, the ALJ held that Plaintiff is not disabled under the Act and denied her SSI benefits. (R. at 19).

## V. DISCUSSION

In her Motion for Summary Judgment, Plaintiff asserts that "[t]he decision of the Commissioner is not supported by substantial evidence in light of the ALJ's failure to adopt a hypothetical that accurately reflects plaintiff's limitations as set forth by Dr. [Dennis] Wayne and her treatment at Mon Yough Community Services." (Docket No. 8). Accordingly, Plaintiff seeks remand of her case. In response, Defendant argues that the hypothetical included all the impairments supported by the record and was therefore accurate and its answer constituted substantial evidence to support the decision to deny benefits. (Docket No. 10).

In constructing a hypothetical question to the VE, the ALJ must lay out all of the plaintiff's impairments supported by the record. *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). "In order for the testimony of a vocational expert to be considered reliable, the hypothetical posed must include *all* of the claimant's functional limitations, both physical and

mental supported by the record." *Hernandez v. Barhart*, 2007 WL 2710388, at *11, Civ. Act. No. 05-9586 (S.D.N.Y., Sept. 18, 2007) (quoting *Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995)). "The most appropriate way to insure the validity of the hypothetical question posed to the vocational expert is to base it upon evidence appearing in the record, whether it is disputed or not." *Gallant*, 753 F.2d at 1456.

The hypothetical in question included the following information:

> … I'm going to ask that you assume that we have an individual the same age, education and work history as the Claimant. In addition, assume that on an exertional basis the individual will be limited to light work and have some additional restrictions. The individual would need to work in a low stress environment and by this I mean a work environment where the individual would not have performed more than simple routine repetitive tasks nor have more that minimal contact with the public.

(R. at 44-45). Essentially, the hypothetical contained the ALJ'S assessment of Plaintiff's residual functional capacity (RFC). Plaintiff's RFC was assessed during the ALJ's analysis of Plaintiff's purported disability under the five step process mandated by 20 CFR §416.920(a)(4).[29] Once the

---

[29] 20 CFR §416.920(a)(4) provides as follows:

(4) The five-step sequential evaluation process. The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step. Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and at step five when we evaluate your claim at these steps. These are the five steps we follow:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

ALJ found that Plaintiff's claimed impairments did not fall within one of the listed impairments in 20 CFR §§416.920(d), 416.925, and 416.926, the ALJ was required to determine Plaintiff's RFC in order to make the ultimate determination on her claim. Here, the ALJ found that Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), but she is limited to a low stress work environment – that is, she can perform no more than simple, routine, repetitive tasks and can have no more than minimal contact with the public." (R. at 13). It was this RFC finding that that was incorporated into the hypothetical.

Plaintiff, in attacking the hypothetical question, argues that the RFC determination was incorrect because it did not specifically include consideration of the records of Dr. Wayne and Mon Yough Community Services. (Docket No. 8). Had these records been incorporated into the hypothetical, Plaintiff asserts, the vocational expert's answer to it would have required the ALJ to award benefits. (*Id*.). In order to evaluate this contention, the Court must review the RFC analysis conducted by the ALJ.

First, the Court must determine the accuracy of Plaintiff's contention that the records form Mon Yough Community Services, including those from Dr. Wayne, were not considered by the ALJ. They were. Specifically, the ALJ stated as follows:

> The claimant [sought] treatment for her depression [in] April 2008, when Dr. William Cutlip of [Mon Yough Community Services] diagnosed partial remission of major depressive disorder, recurrent. Dr. Cutlip observed that the claimant's mood symptoms were generally stable, although some symptoms continued. The claimant next visited Dr. Cutlip approximately 9 months later, in January 2009; he

---

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 416.960(b).)

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See paragraph (g) of this section and § 416.960(c).)

again found claimant's depressive disorder in partial remission, with stable mood symptoms.

The claimant returned to [Mon Yough Community Services] for a 15 minute medication check appointment in June 2009, and was seen for the first time by Dr. Dennis Wayne. Dr. Wayne diagnosed bipolar disorder, noting that the claimant had reported some episodes of hypomanic behavior (though she had not experienced any recent episodes). Dr. Wayne confirmed this diagnosis at another 15 minute medication check appointment six months later in December 2009.

(R. at 15). A review of the records themselves supports the ALJ's analysis of Dr. Wayne's records.

On June 11, 2009, Plaintiff saw Dr. Dennis Wayne for a medication check. (R. at 185). Dr. Wayne found that Plaintiff had a lot of mood lability and mood swings, low energy, and periods of hypomanic episodes in the past. (*Id.*). Dr. Wayne also noted that there was no evidence of psychosis or hallucinations. (*Id.*). He diagnosed Plaintiff as having Mixed Type Bipolar Disorder and assessed a GAF of 50. (R. at 186). Dr. Wayne prescribed Abilify and continued Plaintiff's Remeron treatment. (*Id.*).

Dr. Wayne next met with the Plaintiff on December 22, 2009 for another medication check. (R. at 183). Plaintiff reported to Dr. Wayne that she still felt depressed, had low energy and motivation, and that she was taking Remeron that helped her sleep at night. (*Id.*). Dr. Wayne noted that Plaintiff had minimal mood swings and that she exhibited fair judgment and insight. (*Id.*). He made no changes in her assessment. Dr. Wayne continued her Abilify and Remeron treatment and also prescribed Wellbutrin. (R. at 184).

The record clearly and unequivocally discloses that the ALJ took the records of Dr. Wayne and Mon Yough Community Services into consideration when determining the Plaintiff's RFC, and did so accurately. Moreover, the ALJ's determination of Plaintiff's RFC is challenged only on the basis it did not include consideration of the Wayne/Mon Yough records. Because it

did, there is other basis to hold that the RFC is *not* supported by substantial evidence. Regardless, there is ample evidence reviewed, summarized and analyzed by the ALJ in support of the RFC. (R. at 13-17).

The question now to be answered is whether a recitation of the RFC in the hypothetical is sufficient to render the hypothetical accurate. In the absence of an explicit challenge to the RFC assessment, the Court finds that a hypothetical question incorporating the RFC adequately conveyed Plaintiff's credibly established limitations to the vocational expert because these limitations were incorporated into his RFC determination. *See Konkus v. Astrue*, 2011 WL 9813, at *1, n.1, (W.D.Pa. January 03, 2011).

Because the hypothetical posed to the vocational expert reflected claimant's RFC, and that RFC is supported by substantial evidence, the Court holds that the hypothetical was sufficiently accurate. *See Covone v. Commissioner Social Sec.,* 142 Fed.Appx. 585, 2005 WL 1799366 (3d. Cir. July 29, 2005). As the ALJ's decision is supported by the testimony of the vocational expert, the decision is supported by substantial evidence and is, therefore, affirmed. *See Plummer v. Apfel*, 186 F3d 422, 431 (3d Cir. 1999).

For the forgoing reasons, the Plaintiff's Motion for Summary Judgment is denied and the Defendant's Motion for Summary Judgment is granted.

**VI.    Conclusion**

In this Court's estimation, the Commissioner's decision denying Plaintiff's applications for DIB and SSI benefits is "supported by substantial evidence."  42 U.S.C. § 405(g). Accordingly, Plaintiff's motion for summary judgment will be denied, and the Commissioner's motion for summary judgment will be granted.  In accordance with the fourth sentence of §

405(g), the administrative decision of the Commissioner will be affirmed.  An appropriate order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:    April 19, 2011

cc:      All counsel of record